ZIONTZ *v.* ZIONTZ.

1. DIVORCE—APPEAL—FINDINGS OF TRIAL JUDGE.
   In divorce suits, the Supreme Court generally accepts the findings of the trial judge, provided they are supported by credible testimony.

2. SAME—FINDINGS OF TRIAL COURT—RECORD.
   Findings of trial judge in a suit for divorce, which are wholly unsupported by the record or have nothing to do with the case are not concurred in by the Supreme Court.

3. SAME—EXTREME CRUELTY—CONDONATION.
   Alleged acts of cruelty, by committing an unnatural sex act and requesting wife to indulge in other sexual perversions, may not be made the basis of decree for divorce, where denied by defendant husband and, if charges were true, had been condoned by wife.

4. SAME—INTOXICATION—EVIDENCE.
   Proof as to charge, in defendant husband's cross bill, of intoxication of plaintiff wife *held,* insufficient to entitle defendant husband to a divorce solely on such ground.

5. SAME—ADULTERY—EVIDENCE
   A charge of adultery in a suit for divorce requires very positive testimony to substantiate it, opportunity alone being insufficient.

6. SAME—ADULTERY—EVIDENCE.
   Evidence of adultery by wife, as charged by defendant husband in his cross bill *held,* insufficient to brand mother of two children as guilty, but sufficient fully to justify husband's suspicions and to invite his charges.

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 3 Am. Jur., Appeal and Error, § 896 *et seq.*
[3] 17 Am. Jur., Divorce and Separation, §§ 198, 202.
[5] 17 Am. Jur., Divorce and Separation, §§ 389, 392.
[7] 58 Am. Jur., Witnesses, §§ 865, 872.
[9] 17 Am. Jur., Divorce and Separation, §§ 64, 65.
[11] 17 Am. Jur., Divorce and Separation, § 683.

7. WITNESSES—CREDIBILITY.

Not much credence may be given to the testimony of a prevaricating witness who gives contradictory and incomplete testimony in an evasive manner about a recent event.

8. DIVORCE—OCCURRENCES AFTER FILING OF BILL—EVIDENCE.

Testimony may be given at the hearing of a divorce case as to occurrences after the filing of the bill.

9. SAME—EXTREME CRUELTY—FALSE ACCUSATIONS OF INFIDELITY.

The making of false and unfounded charges of infidelity by a spouse is extreme cruelty *per se.*

10. SAME—EXTREME CRUELTY—ADULTERY—EVIDENCE.

Evidence in suit for divorce *held,* sufficient to justify granting defendant a divorce on his cross bill on ground of extreme cruelty, although insufficient to support charge of adultery.

11. SAME—CUSTODY OF CHILDREN—FORFEITURE OF STATUTORY PREFERENCE OF MOTHER.

Where testimony clearly demonstrates unfitness of plaintiff mother to have custody of 6- and 2-year-old children of the parties is present, custody is awarded to husband who is not shown to be in any way unfit to have their custody, since the mother has forfeited the statutory preference by gross misconduct (3 Comp. Laws 1929, § 12852).

12. SAME—DIVISION OF PROPERTY—CHATTEL MORTGAGE.

Where decree for divorce is awarded husband on his cross bill on his appeal from decree for wife, division of property which left him currently with about equal assets and liabilities plus half interest in homestead of which right to possession until remarriage was awarded to wife together with household goods, is affirmed, but trial court's requirement that he pay chattel mortgage on car she had purchased after bill was filed, is reversed.

13. SAME—OCCUPANCY OF HOME—TAXES—INSURANCE—REPAIRS.

Where occupancy of home until remarriage of plaintiff wife is awarded her, defendant husband is required to pay taxes and insurance and plaintiff the other expenses except that major repairs are to be borne equally.

14. SAME—CARPETING OF HOME.

Bill for carpet used in home occupied by parties during marriage is ordered paid by husband upon decree for divorce.

15. SAME—ATTORNEY FEES—COSTS—MODIFICATION OF DECREE.

Allowance of $500 attorney fee to plaintiff wife's attorney is affirmed on appeal without further costs to either party,

where decree of divorce is awarded husband on his cross
bill on his appeal from decree for wife, division of prop-
erty is somewhat modified, custody of children awarded to
father and he relieved of paying alimony for their support.

Appeal from Kent; Brown (William B.), J. Submitted January 14, 1949. (Docket No. 19, Calendar No. 44,247.) Decided April 11, 1949. Rehearing denied May 18, 1949.

Bill by Greta L. Ziontz against Harold J. Ziontz for divorce on ground of extreme and repeated cruelty. Cross bill by defendant against plaintiff for divorce on grounds of adultery and extreme and repeated cruelty. Decree for plaintiff. Defendant appeals. Reversed and decree ordered entered for defendant in this Court on ground of extreme and repeated cruelty. Custody of children awarded to defendant.

*John J. Smolenski,* for plaintiff.

*Searl, White & Brooks,* for plaintiff on application for rehearing.

*Linsey, Shivel, Phelps & Vander Wal,* for defendant.

BUTZEL, J. Greta L. Ziontz, plaintiff, brought suit for divorce against Harold J. Ziontz, defendant, on August 13, 1947. The parties were married April 7, 1940, in the city of Chicago and lived together until the filing of this suit except for a short period in the latter part of 1946 and the early part of 1947. A suit for divorce by the plaintiff against the defendant begun in November, 1946, was dismissed after a reconciliation in February, 1947. They have two children, Bonnie, born August 5, 1942, and Pamela, born March 5, 1947. At the time of the hearing plaintiff and defendant were respectively 27 and 29 years of age.

"Plaintiff in charging defendant with extreme and repeated cruelty alleges that he was quarrelsome and continually finding 'fault; that he was parsimonious and refused to support her properly; that he objected to certain associations with other women and her lady friends; that he was extremely jealous of her; and that he refused to divide his property with her as agreed to at the time of the reconciliation. She states he has a large income and owns a large amount of property in his own name with the exception of the home at 1012 Walsh street S. E., Grand Rapids, Michigan, purchased in 1947, for $12,500, and the title to which stands in the joint names of husband and wife, and also a Studebaker car to which she has title. She further alleges that the parties had nothing when they married, defendant attending a college of osteopathy at that time, while she worked to support them until he graduated. She later worked in his office when he first started to practice. This was during the war when it was very difficult to secure any assistants. For this particular reason she also claims a share of the property.

In his answer the defendant denies all the allegations of cruelty and alleges affirmatively that plaintiff has always had help in the home since they were able to afford it and that she had the right to write checks on their joint bank account. He denies the allegations as to his earnings and the amount of property she claims he owns. He claims the reconciliation, after the first bill of divorce, was effected because plaintiff shortly expected their second child and he hoped they could get along and keep the family together. He also worked after they were married and while he was still in college in order to help with the expenses.

In a cross bill he seeks affirmative relief against the plaintiff and asks for an absolute divorce and

custody of the children. He charges plaintiff with two specific acts of adultery and with extreme and repeated acts of cruelty. He alleges that she had improper relations with other men and especially one, whom we shall refer to as "Bud," with whom it is claimed she was infatuated and whom she intended to marry as soon as she could obtain a divorce. He charges that she used intoxicating liquors excessively and he had requested certain dealers to refuse to sell liquor to her; that she neglected the children; that in 1943 she became angry and threw a metal sink receptacle at him; that although he has always furnished her with an adequate home and many luxuries and allowed her the use of his bank account, she abused such privileges and was extravagant; and that she was often insulting to his patients and professional associates. Plaintiff filed an answer to all affirmative allegations in defendant's answer and also to the cross bill. She denied all of defendant's charges. She also made some further charges against defendant, but offered no proof in support of them.

The record consisting of 525 pages presents solely questions of fact. In divorce suits particularly, we generally accept the findings of the trial judge, provided they are supported by credible testimony. In this case we cannot agree with the findings of the circuit judge. Many of them are wholly unsupported by the record, others have absolutely nothing to do with the case. Such further facts as may be necessary for an understanding of the issues will be referred to in our discussion.

When the parties married in 1940, over seven years prior to the filing of the bill of complaint, defendant was completing his education, while the plaintiff was a clerk in a Chicago store. A previous marriage of the plaintiff had been annulled because of her extreme youth. Neither of the parties had

any property at the time. Plaintiff agreed to contribute her earnings so that they could live together while defendant completed his studies. Defendant, however, worked on Saturdays and also one night during the week and did contribute towards the expenses. They lived very frugally. After defendant graduated he worked in the steel mills in order to raise money to pay off the amount still due for his tuition and thus obtain his diploma. The parties then moved to Mayville, Michigan, where the defendant started to practice. There was a scarcity of doctors because of the war and defendant soon built up a large practice. At first plaintiff did assist defendant to a very large extent, not only as a receptionist, but also as nurse, bookkeeper and in many other ways. He had a very large number of obstetrical cases as well as an extensive general practice. Shortly after they came to Michigan, plaintiff became pregnant and Bonnie, their first child, was born. Plaintiff, however, did continue to help defendant at times as help was scarce. In 1943, they moved to Grand Rapids where defendant continued to work hard and he built up a very large and lucrative practice.

At the time of the hearing, defendant testified that his practice was netting him $200 a week; plaintiff claims that it was five times that amount. Defendant continued his education by correspondence courses and also attended lectures when necessary. While the suit was pending he completed the requirements and successfully passed the examinations so as to also become a doctor of medicine. The very large number of obstetrical and surgical cases as well as other house calls and extensive office practice kept him busy and away from home much of the time and his hours at home were uncertain and curtailed. He evidently indulged his wife in doing many of the things that possibly contributed to the

difficulties that thereafter arose. She evidently was attractive in appearance, and was fond of swimming and other sports. He furnished her with a good home and they moved three times while in Grand Rapids, each time buying a better home and selling the former one. She had the use of the checking account, and charge accounts at leading stores, and access to a joint safety-deposit box. In 1945, he bought her the new Studebaker car for her own use. He bought a cottage at Bostwick lake and they spent their summers there. After they moved to Grand Rapids she had help in the home.

The claims by the plaintiff, as to the acts of cruelty by the defendant, were supported only by the testimony of plaintiff. Although the judge in the main seems to have believed her completely, he evidently paid little attention to many of her charges of cruelty for he does not even mention them in his finding of facts. Plaintiff claims defendant in one instance committed an unnatural sex act and at other times she refused to indulge in sexual perversions which he requested. Defendant emphatically denied these charges. Even had there been any truth in them, such acts were condoned. As to the other acts of cruelty charged in the bill of complaint her testimony was contradicted by the testimony of many of her own witnesses, who testified that the defendant's actions toward his wife and family were kind and proper. In fact the judge below granted the divorce principally on the ground that cruelty was shown by the charges of infidelity made in the cross bill.

A careful reading of the record indicates that the plaintiff's conduct was such as to naturally arouse defendant's suspicions. Defendant complains particularly of her conduct with Bud. The latter and his family had been close friends of both plaintiff and defendant for years, while Bud was growing up.

He is an attractive, athletic young man about five years younger than plaintiff. At the time of the hearing he was a student at a premedical school. After his discharge from the army, he became a very frequent companion of the plaintiff. This has continued even after the cross bill was filed and even at the time of the hearing. Many of the acts of intimacy between plaintiff and Bud, as testified to, would appear perfectly innocent and not a ground for divorce. However, some more serious charges were made and testified to by witnesses for defendant. They indicate that there was more than a mere platonic friendship or a brotherly and sisterly relationship between unrelated parties, as claimed.

It was testified that plaintiff was careless about exposing her person before strangers; that the milkman stopped at her home each day and remained there for a considerable period. An office assistant of the defendant having occasion to enter the kitchen of their home claims that she found the milkman on the floor and plaintiff beside him with a part of her person exposed. Both plaintiff and the milkman denied this. It was admitted that he repeatedly stopped at the home for a longer period than necessary to deliver milk, but that defendant knew of it and was often present. Defendant and the milkman were friends and went fishing together. The judge made light of this charge. One of the instances of adultery charged was claimed to have occurred while plaintiff was at a private hospital as a patient. The judge properly dismissed it on the ground of improbability. The charge resolved itself largely into a question of credibility. It was further shown that plaintiff did become intoxicated at times but not to such an extent as to entitle defendant to a divorce solely on that ground.

The other charge of adultery is more serious and

involves Bud. Just prior to plaintiff's filing the bill of divorce and after the defendant became very suspicious of the plaintiff's conduct and their relationship had reached the breaking point, defendant hired a private detective, formerly a police officer, to watch the plaintiff. He watched her only for a few months, and principally during the period immediately after the bill for divorce was filed. He testified to seeing plaintiff and Bud together many times at different places and particularly one time at the State park at Grand Haven. Plaintiff had rented a trailer and taken it to the State park with her two children and Bud's sister. Bud was often there and one particular night when the sister was away, the detective testified that he saw Bud and the plaintiff enter the trailer whereupon the lights went out and the detective and another witness heard sufficient to confirm their suspicions as to the adultery. The detective watched the trailer for some time and as no one came out he went to the police in Grand Haven and then to the office of the park. He then returned to the trailer with a police officer and a park officer. The latter entered the trailer and found plaintiff there alone with the children. Bud was lying between some blankets in the sand a very short distance from the trailer and appeared to be asleep. He was clad only in his undershorts, and when aroused he went to the trailer and asked plaintiff to hand him his clothes from therein. He claimed he had not been inside the trailer but had handed plaintiff his clothes from the outside. He was ordered out of the park as he was not registered, it being against the rules for an unregistered person to be in the park at that time of the night.

We appreciate that opportunity alone does not prove adultery and it requires very positive testimony to substantiate such a charge. However, we

are mindful of the statement by the Court in *Marble* v. *Marble*, 36 Mich. 386, as follows:

"The evidence to show the fact of adultery is made up of circumstances. There is no direct proof of any single fact able to afford a conclusive or very stringent inference. But when all the circumstances are combined and the natural inferences and presumptions are allowed their due weight, the proof so presses and convinces that it is difficult to reject belief, * * * seem hardly capable of being accounted for and explained except upon the ground that the relation charged actually existed between these persons."

But as convincing as the above testimony may seem, we are reluctant to brand the mother of two little children as guilty of a crime without more positive proof. Thus the charges of adultery must be dismissed, though there is ample evidence of misconduct or improper relations with Bud so as to fully justify the defendant's suspicions and charges.

Plaintiff is quite vehement in her denial of any misconduct and the judge evidently believed her completely, and even went so far as to speak favorably of the testimony of Bud. Plaintiff's testimony on closer examination is very unsatisfactory. She was contradictory and evaded questions she did not wish to answer and often when pressed refused to give direct answers. We particularly refer to one instance. It seems that only two months prior to the trial of the case, plaintiff traded in her Studebaker car together with the proceeds from the sale of a diamond ring on the purchase price of a Chevrolet convertible coupe. She first testified that she did not give a mortgage to finance the balance of the price of the car, that she broke even with the sale of the ring and the old car. When, however, she was pressed for an answer to the question of whether there was not a chattel mortgage downstairs (in the

court house) on the car, she first parried with the question and answered, "Not that I know of." When she was again asked about the chattel mortgage, her reply was, "I don't know." When she was reminded that it happened only a short time ago, she flatly refused to answer. Finally, when the judge also asked her why she did not answer, she admitted that she did give a mortgage but refused to tell the amount of it, or how much the balance was. When a witness prevaricates in this manner in open court, and is defiant in refusing to give answers, we cannot give much credence to her testimony.

Defendant, however, further shows that plaintiff became violent in personal attacks on defendant. We have heretofore referred to the time when she seized a garbage receptacle and struck him with it cutting him over the eye. Testimony may be given at the hearing of a divorce case as to occurrences after the filing of a bill. *Arix* v. *Arix,* 212 Mich. 438. At another time, after the filing of this bill and prior to the hearing, defendant went to the home on Walsh street to see the children. He had a right to do so under the order of the court. Because of previous experience and charges by the plaintiff he always took a friend along on such visits, who this time was an instructor of athletics in one of the schools. Defendant, a doctor, found the children ill with colds and he made the statement that if the plaintiff would give them proper care they would not constantly have colds. Plaintiff, thereupon, flew into a violent rage, seized a poker and struck at defendant's head. The blow struck him with a great force on the shoulder. She thereupon tore off his shirt and tie and smashed his glasses against the wall. Defendant did not strike back or attempt to further provoke her. The testimony shows that she struck him so hard that she bent the poker; this she denies, but does admit striking him.

Defendant apparently is not a weak man and he must have exercised considerable self-restraint in not striking back. Regardless of the remarks of the judge, such an attack was not justified by defendant's statement concerning the care of the children. It was shown the children had been ill, and that Bonnie had been in the hospital for observation. The fact that the children were brought into court and one sat on their mother's lap and they appeared well dressed and cared for may have been just window dressing such as is sometimes indulged in by attorneys. It is not worthy of the importance attached to it by the court below in his findings of fact.

It was further shown that the plaintiff interfered with and often prevented the defendant from seeing the children on the days set by the court pending the hearing. In connection with the personal assaults on the defendant, we refer to the so-called "dog incident." It seems that plaintiff decided she needed protection against the defendant and so purchased a Great Dane dog and kept it around the house. At one time shortly thereafter the defendant had returned Bonnie to the home and was leaving when plaintiff came around the side of the house with this dog. She followed the defendant down the street with the dog between them, and she taunted him. Defendant managed to get away by jumping into a taxi which drew up across the street to let out some people. The danger involved to defendant is not important, but it shows the type of scenes the plaintiff was capable of making in public and her treatment of the defendant.

At one time long before the suit was begun, defendant told his wife he had an income tax return prepared for a small fee so that it only required the payment of a very small tax. After the filing of this bill, plaintiff went to the authorities and re-

ported defendant's delinquency. As a result, defendant was ordered to pay over $26,000 in back taxes, penalties, and interest. Of this amount defendant has paid over $16,000 but still owes between $10,000 and $11,000. He testified that he has exhausted all the savings that he had accumulated and to which his wife at one time had had access. Defendant's failure to pay his taxes was inexcusable. We mention the incident only to show the hatred on the part of the plaintiff and the present condition of defendant's financial position.

Thirty-four witnesses testified on behalf of defendant. This by itself is not conclusive, but we cannot overlook the testimony of some of these witnesses in regard to plaintiff's improper conduct. One witness, a businessman of Lowell, Michigan, and who apparently had no interest whatsoever in the case, fully corroborated the testimony of the detective in all particulars in regard to the trailer incident. Plaintiff was the only one of her 13 witnesses who testified to defendant's alleged cruelty. The making of false and unfounded charges of infidelity by defendant is cruelty *per se.* However, even though they were not proven, there was a sufficient showing to amply justify the suspicion and invite the charges. Bud testified the defendant hired him to do certain work around the summer cottage that required his very frequent presence there. This defendant denied. Bud did do some work but it did not require the time he spent there. Bud also claims that though unrelated he and plaintiff were very friendly; that their relationship was more like that of a brother and sister.

The trial judge filed a 28-page opinion. We shall not refer to comments therein that are in no way connected with the case. His opinion seems largely based upon the fact that the detective rendered a bill for $1,570, evidently covering both expenses and

services, and in settlement of which he accepted $1,200. The judge was impressed with the failure to discover proof of serious delinquencies of plaintiff after being watched for what the judge believed to be a very long period. The judge stated it was from 1943 to 1947, when as a matter of fact it covered only a few months as shown by the testimony. The reports do show that there was intimate relationship between plaintiff and Bud's family who were present on many occasions but very frequently plaintiff and Bud were alone. The judge seems to have been impressed by plaintiff notwithstanding her refusal to answer pertinent questions. The judge even made aspersions on the doctor's medical knowledge. Defendant, in reading from another doctor's medical report, repeated a medical term mentioned thereon. The judge in commenting upon the testimony of defendant stated that there was no such medical term. The medical term used was absolutely correct; the judge was mistaken. We only mention this to show the extent to which the judge seemed to have discredited the testimony on behalf of defendant.

From a careful reading of the record we must reach the conclusion that the court below was in error in awarding a divorce to the plaintiff. Even though the defendant may have failed to prove the charge of adultery, the other proof of plaintiff's conduct toward defendant is such that it constituted cruelty as charged in his cross bill. The defendant is entitled to a decree of divorce on his cross bill and the plaintiff is denied a divorce on her bill of complaint. Although there may be serious doubt in our minds, in view of all the testimony as to the character of the plaintiff, under the policy of the statutes and the decisions as to small children, we award the custody of the children to the plaintiff, subject, however, to the following conditions: (a)

Defendant shall have the right to visit the children twice a week during the week days and to take them with him at those times, the visitation days to be agreed on by the parties, in case of disagreement, by the court, in the final decree; he shall also have a right to have the exclusive custody of the children every other Sunday afternoon;   (b) Defendant shall have complete and exclusive custody of the children for a period of four weeks every summer; (c) The custody of the children shall be supervised by the friend of the court to the extent that he is to investigate any complaints and to report them to the judge.   Such custody is always subject to the further order of the court; (d) The plaintiff shall get rid of the Great Dane dog forthwith and not harass the defendant on his visits to the children.   .

The testimony would indicate that the parties owned jointly the homestead at 1012 Walsh street S. E., Grand Rapids, Michigan.   This is worth approximately $12,500.   Defendant owns the summer home at Bostwick lake which cost $6,400 and also a vacant lot of little value in the rear of the summer home.   At the time of the hearing there was $4,657.-41 still due on a land contract for the sale of property in the name of plaintiff and defendant, the vendors.   The judge decreed that plaintiff should become the sole owner of the homestead and defendant the sole owner of the Bostwick lake property and the land contract.   The latter 2 items are worth but little more than the sum defendant owes the government for taxes, penalty and interest.   The record shows no appreciable amount of personal property of any kind owned by defendant.   The household goods in the homestead the court below properly gave to plaintiff and those at the cottage to defendant.   The judge also ordered defendant to pay the $1,000 chattel mortgage that plaintiff had placed on her new car and which we have heretofore

discussed. He also ordered defendant to pay a $90 bill for a carpet which was put in one of the former homes before the parties separated. It is proper that defendant pay the latter bill but not the amount due on the mortgage on the new car.

The weekly alimony of $85 per week as found by the court shall be continued until the further order of the court. The property at 1012 Walsh street, S. E., Grand Rapids, Michigan, now owned by the entireties, is to be held by the parties as tenants in common, subject to the right of plaintiff to occupy the entire home rent free as long as she wishes but not in case she remarries. The taxes and insurance are to be paid by the defendant and other expenses by the plaintiff, except all necessary major repairs shall be borne equally by the parties. The Bostwick lake cottage property and the interest in the land contract together with all payments due thereon shall become defendant's sole property. The furniture and household goods in the Walsh street house shall belong to plaintiff while the furniture and household goods in the Bostwick lake cottage property shall belong to defendant. The mortgage on the car is the sole debt of the plaintiff and defendant shall not be held liable for its payment. The $90 due for the carpet is to be paid by the defendant. As to his life insurance, plaintiff is to have no further interest as provided by the decree below, and the defendant shall have all rights reserved to him under the policies, though he probably will want to keep up the policies for the benefit of the children.

The allowance of $500 attorney fees to plaintiff's attorney, as allowed by the trial court, is affirmed. No further costs will be allowed either party in this Court. A decree in accordance with this opinion should be entered in this Court.

Bushnell, J., concurred with Butzel, J.

DETHMERS, J. (*concurring in part*). I concur in the opinion of Mr. Justice BUTZEL, except as relates to custody of children and payment of alimony.

The opinion mentions plaintiff's frequent intoxication; her repeated improper exposures of her person; her being, while thus exposed, on the kitchen floor with the milkman; the trailer episode with its attending circumstances, persuasive to two witnesses of plaintiff's adultery; her violent physical attacks on defendant. The record reeks of unseemly conduct and intimacies between plaintiff and men other than her husband. Some of this occurred in the presence of the oldest child, as did also drinking, cursing and filthy talking on the part of plaintiff and such men. The sordid details need not be recounted.

Furthermore, the record discloses plaintiff's repeated and continuous neglect and disregard for the welfare of the children. She was constantly away from home all day long, leaving the children to the care of young girls. Despite the family's ample means, the oldest daughter was found to be undernourished and in a run-down condition. Plaintiff exhibited a lack of patience with or affection for the children, on one occasion being overheard to say to her husband, to quote a disinterested witness, "that she was going to kill the child if it didn't keep quiet and she wished it was dead." The preference accorded the mother by statute (3 Comp. Laws 1929, § 12852* [Stat. Ann. § 25.311]) plaintiff has, in this case, forfeited by gross misconduct and a demonstrated unfitness. At the same time, it appears that defendant has been a kind, considerate and affectionate father, concerned about his children. He was not shown to be in any way unfit to have their custody. An award of custody to the

---

* 4 Comp. Laws 1948, § 722.541.—REPORTER.

mother would do violence to the best interests of the children.

For these reasons, I believe that the decree should grant custody of the two children of the parties to the defendant and that he should be required to pay plaintiff no alimony whatsoever; but that in all other respects the decree should provide as directed in Mr. Justice BUTZEL's opinion.

SHARPE, C. J., and BOYLES, REID, NORTH, and CARR, JJ., concurred with DETHMERS, J.